UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| TERANCE CHRISTOPHERSON, | |
| Plaintiff, | |
| v. | Civil Action No.: |
| WAYFAIR, LLC, | |
| Defendant | |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES Plaintiff, Terance Christopherson ("Plaintiff" or "Christopherson")[1], by and through her undersigned counsel, and complains against Wayfair, LLC ("Defendant" or "Wayfair") as follows:

JURISDICTION AND PARTIES

1.      This case arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. 4551 *et seq.*; the Maine Whistleblowers Protection Act ("MWPA"); the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; and the Age Discrimination in Employment Act of 1967 ("ADEA"),  29 USC §§ 621 *et seq.*

2.      Terance Christopherson is a United States citizen and at all times relevant to this complaint resided in the Town of Monmouth, County of Kennebec, State of Maine.

3.      Wayfair is a limited liability company with a principal place of business in Boston, Massachusetts.

---

[1] Ms. Christopherson has recently shared that she is a transgender woman. Her protected status as a transgender woman is not relevant to this case. However, from here on out, Ms. Christopherson will use her preferred pronouns "she/her".

4.      Wayfair is an e-commerce company that sells furniture and home goods online.

5.      Wayfair had over 10,000 employees at all times relevant to this matter.

6.      This Court has subject matter jurisdiction over Plaintiff's federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

7.      On or about March 30, 2023, Ms. Christopherson filed a timely Complaint/Charge of Discrimination against Wayfair alleging unlawful discrimination with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

8.      On or about November 17, 2023, Ms. Christopherson filed an Amended Complaint/Charge of Discrimination against Wayfair alleging unlawful discrimination and retaliation with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

9.      On or about March 31, 2025, the MHRC issued a finding of reasonable grounds that Defendant discriminated against Ms. Christopherson based on disability and retaliated against her for engaging in protected activity.

<u>JURY TRIAL REQUESTED</u>

10.     Plaintiff requests a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

11.     Ms. Christopherson is a skilled and experienced IT professional and software engineer.

12.     Ms. Christopherson was sixty-three (63) years old when Wayfair terminated her employment.

13.     Ms. Christopherson is diagnosed with Asperger's Syndrome.

14.     The DSM-IV explains that Asperger's is marked by a "qualitative impairment in social interaction as manifested by at least two of the following: (1) marked impairments in the use of nonverbal behaviors such as eye-to-eye gaze, facial expression, body postures, and gestures to regulate social interaction; (2) failure to develop peer relationships appropriate to developmental level; and (3) a lack of spontaneous seeking to share enjoyment, interests, or achievements with other people (e.g., by a lack of showing, bringing or pointing out objects of interest to other people); (4) lack of social or emotional reciprocity."

15.     The DSM-V later added, "Individuals with a well-established DSM-IV diagnoses of autistic disorder, Asperger's disorder, or pervasive developmental disorder not otherwise specified should be given the diagnosis of 'autism spectrum disorder.'"

16.     Asperger's Syndrome, now classified under Autism Spectrum Disorder (ASD) in the DSM-5, is recognized as a disability under the Americans with Disabilities Act (ADA).

17.     The ADA defines a disability broadly, covering conditions that impair cognitive, social, or communicative functions. Individuals with Asperger's often experience difficulties with social interaction, nonverbal communication, and adapting to changes in routine— limitations that can significantly impact major life activities such as working, learning, and interacting with others.

18.     Courts and the Equal Employment Opportunity Commission (EEOC) have acknowledged that autism spectrum disorders, including Asperger's, meet the ADA's definition of a disability.

19.     At all relevant times, Ms. Christopherson had a diagnosis of Asperger's Syndrome/autism spectrum disorder while working for Wayfair.

20.     On August 26, 2021, Wayfair recruited Ms. Christopherson as an Associate for the Maine Supplier Integrations Team.

21.    Ms. Christopherson's starting pay was $17.31.

22.    Ms. Christopherson was later promoted to Senior Operations Specialist.

23.    At the time of her termination, Ms. Christopherson's pay was $24.75.

24.    During Ms. Christopherson's employment with Wayfair, she reported to the department leader, Derek Dumont ("Dumont"), and the following managers: Steven Barndollar ("Barndollar"), Matt McLaughlin ("McLaughlin"), and Pallavi Soni ("Soni").

25.    In early 2022, Ms. Christopherson reported to McLaughlin who reported to Barndollar who, in turn, reported to Dumont.

26.    Wayfair was not aware of Ms. Christopherson's Asperger's Syndrome/autism spectrum disorder diagnosis when they hired her.

27.    Ms. Christopherson's job duties required her to, among other things, respond to Wayfair's "tickets". A "ticket" is a request for a member of the supplier integrator team to assist in responding to issues within the company's systems. As part of her job duties, Ms. Christopherson also set up EDI communications, built AS2 connections, and dealt with security certificates.

28.    At all relevant times, Ms. Christopherson's job performance met or exceeded Wayfair's expectations.

29.    On December 15, 2021, Ms. Christopherson reported Barndollar to Wayfair for giving a team member a spreadsheet of over one hundred (100) potential supplier names and instructing them to complete supplier questionnaires with random data to boost his numbers and help him secure a year-end bonus by making it appear that he onboarded more suppliers than he actually did. Barndollar's actions were directly in violation of company policy, constituted fraud, and would have caused the creation of over one hundred accounts with bad data.

30.    Ms. Christopherson reported Barndollar to shed light on and oppose a condition or practice that she believed was illegal and fraudulent.

31.     After she reported Barndollar, Dumont sent Ms. Christopherson a Slack message regarding Barndollar's actions. In his message, he asked Ms. Christopherson to ensure that team members were following procedure.

32.     Dumont held bi-weekly group meetings. In early December, 2021, McLaughlin brought up the service level agreements, which specified the time in which employees were expected to complete a ticket. During this bi-weekly meeting, Dumont asked for feedback on the pain points that employees were experiencing.

33.     Ms. Christopherson suggested that Dumont should look to get some of the systems fixed because the system's bugs were bad. She also suggested that they get the system functionality documented and fix their standard operating procedures because they were inaccurate.

34.     After the meeting, Dumont called Ms. Christopherson into a one-on-one meeting and stated in an angry tone, "You are just a L1 and if you ever want to get anywhere in Wayfair, then don't bring problems into my meetings. Bring solutions." An L1 is the lowest level at Wayfair.

35.     On January 14, 2022, during a group meeting, Dumont told employees, including Ms. Christopherson, that they were required to do a "Peek at you", where Dumont required Ms. Christopherson and her coworkers to create slideshows on PowerPoint showcasing their personal lives and history with pictures.

36.     The "Peek at you" was not relevant to Ms. Christopherson's job duties.

37.     Ms. Christopherson mentioned that she was uncomfortable with doing a "Peek at you" and didn't believe it was legal for Dumont to require employees to present personal life information about their lives to other employees in a meeting.

38. Dumont ignored Ms. Christopherson and asked for volunteers for who was going to be first to present at the next meeting.

39. On January 28, 2022, during the first "Peek at you", Dumont assigned Barndollar to manage and oversee the employees' presentations.

40. Ms. Christopherson did not participate in the "Peek at you".

41. At the end of the meeting, Barndollar said, "These are voluntary but if you don't do one, you will leave everyone's interpretation of your life to our interpretation and the mind will think what it thinks and we might wind up thinking unsavory weird things about you, like you have something to hide".

42. On January 28, 2022, Ms. Christopherson emailed Dumont and told him that she thought Barndollar's comments were inappropriate.

43. On February 1, 2022, Dumont called Ms. Christopherson into a last-minute meeting to discuss Barndollar's comment during the "Peek at you" presentations.

44. Dumont claimed that the "Peek at you" presentations were not mandatory.

45. Ms. Christopherson replied that Dumont did say that they were mandatory.

46. Dumont said that Ms. Christopherson was being very negative and continuing to bring negativity into meetings and causing more problems.

47. Dumont continued to deny that he said the "Peek at you" was mandatory.

48. Dumont and Ms. Christopherson went back and forth until she felt bullied and wanted the conversation to end, so she told Dumont that maybe she did not hear him say it.

49. Dumont then said in a loud and angry voice, "that's what I thought, you have to pay attention to these meetings and fully pay attention, they are an important part of your job."

50. Dumont then stated, "About Steve's comments, I think you should speak directly to Steve about them, if you think they were inappropriate."

51.     Ms. Christopherson told Dumont that she did not feel it was her place to speak to Barndollar about this incident.

52.     Dumont then asked if Ms. Christopherson thought Barndollar's comments were really inappropriate.

53.     Ms. Christopherson replied, "yes".

54.     Dumont responded, "well if you thought it was creepy, then I'll take action on it. I do want to make sure though that you understand I never said mandatory and you have to pay attention in meetings." The meeting ended.

55.     On February 4, 2022, during Ms. Christopherson's weekly one-on-one meeting with McLaughlin, she explained that Dumont had called her into two one-on-one meetings, and she felt like he was backing her into a corner to get her to say what he wanted her to say.

56.     McLaughlin replied, "When you're in Derek's bi weekly meetings, keep your head down, nod and smile and don't talk. If you have a problem, you should talk to me in our weekly one on one meetings."

57.     On February 25, 2022, during a weekly one-on-one meeting with McLaughlin, he provided Ms. Christopherson with a spread sheet titled "People Principles" and told her that she should fill out something for each of the "3 pillars" of the "People Principles".

58.     Ms. Christopherson read the sheet explaining the "3 pillars" of the "People's Principles" and explained to McLaughlin that it did not make any sense to her.

59.     McLaughlin went through each one and provided examples.

60.     Ms. Christopherson said that "3 pillars" still did not make any sense to her.

61.     During the course of this meeting, McLaughlin eventually said that the way that Ms. Christopherson spoke and the tone of her voice were a problem.

62.     Ms. Christopherson apologized and explained that it was not intentional. She disclosed to McLaughlin that she has Aspergers Syndrome and how she speaks and her tone of voice are not intentional.

63.     Ms. Christopherson provided McLaughlin with a copy of her diagnosis and requested he keep it confidential.

64.     McLaughlin did not keep Ms. Christopherson's diagnosis confidential.

65.     McLaughlin violated the confidentiality provisions of the ADA and MHRA when he shared Ms. Christopherson's confidential medical information that she had only provided in connection with his comments regarding her manner of speaking.

66.     On March 25, 2022, McLaughlin, without discussing anything with Ms. Christopherson first, filed a retaliatory HR complaint against her and stated the following: "I wanted to have a discussion with talent regarding one of my direct reports. In the people principals of We Drive Results and We are Always Improving, this employee does a great job, however under We Win Together, particularly in respect others, they are not meeting expectations, continually disparaging Wayfair as a whole. This direct report has self-reported themselves as neurodivergent, so I have been more lenient than I normally would be, but would like to discuss different techniques I can employ to work with this employee."

67.     "Neurodivergent" is a slang term for autism. Ms. Christopherson never referred to herself as "neurodivergent".

68.     McLaughlin's comments about Ms. Christopherson to Wayfair are direct evidence of disability discrimination.

69.     On March 28, 2022, Ms. Christopherson emailed Dumont regarding McLaughlin's complaint and reported his discriminatory statements and actions. Ms. Christopherson also provided Dumont an official copy of her diagnosis of Asperger's Syndrome.

70.     Ms. Christopherson's motivation for disclosing her Asperger's Syndrome diagnosis and reporting McLaughlin's discriminatory complaint was to shed light on and oppose a condition or practice that she had reasonable cause to believe was illegal and in violation of the ADA, MWPA, and MHRA.

71.     On that same day, Ms. Christopherson sent a message to the human resources representative, Nadja Friedrich ("Friedrich"), regarding McLaughlin's ticket. Friedrich arranged a time to speak with Ms. Christopherson.

72.     On March 30, 2022, Ms. Christopherson had a meeting with Friedrich regarding McLaughlin's ticket. At the conclusion of the meeting, Friedrich required McLaughlin to apologize to Ms. Christopherson.

73.     McLaughlin admitted having a prejudiced opinion of Ms. Christopherson based on his perception of autism from watching television and other entertainment.

74.     McLaughlin also apologized to Ms. Christopherson for his fear of her due to her having Asperger's Syndrome, and for having disclosed her disability without her permission.

75.     Friedrich asked if it was okay with Ms. Christopherson if she closed this matter.

76.     Ms. Christopherson said, "yes".

77.     On that same day and shortly after her HR meeting, Dumont sent Ms. Christopherson a slack message stating: "Hey Terance, I want to huddle up with you real quick so we can talk about some of the points on your email and understand you've had some heavy discussions today already. Let me know a good time to meet with you today or tomorrow."

78.     Ms. Christopherson was afraid that Dumont would bully her.

79.     Ms. Christopherson replied that she was swamped with work and that both McLaughlin and Friedrich had apologized to her, so she would prefer to drop it but they could discuss it later.

80.     Dumont responded that he would set up a meeting for the following day at 1:30 pm.

81.     Ms. Christopherson was concerned that Dumont would bully her again.

82.     On that same day, Ms. Christopherson sent a message to Friedrich about her concerns regarding Dumont's meeting.

83.     Friedrich replied that she would speak with Dumont.

84.     On March 31, 2022, shortly before the meeting with Dumont, the meeting disappeared from Ms. Christopherson's calendar and Dumont deleted his messages to Ms. Christopherson in Slack.

85.     Additionally, McLaughlin's HR ticket also disappeared from the system.

86.     In April of 2022, within weeks of the incident relating to Ms. Christopherson's disability, McLaughlin was moved to a different position.

87.     When Ms. Christopherson later tried to contact Friedrich to find out what happened to the ticket, she learned that Friedrich was no longer working for Wayfair.

88.     Dumont did not mention McLaughlin again.

89.     Soni replaced McLaughlin as Ms. Christopherson's manager.

90.     Ms. Christopherson told Soni that she has Asperger's Syndrome.

91.     In May of 2022, during a one-on-one meeting, Soni asked Ms. Christopherson personal questions about her life and discussed little-to-no business. Ms. Christopherson requested that Soni stop these meetings unless there was Wayfair business to be discussed.

92.     Soni replied with something to the effect that they were "friends" and these types of meetings were necessary.

93.     Ms. Christopherson replied they were business associates, not friends.

94.     Soni then questioned how they would work together if they could not be friends and have friend conversations.

95.     Ms. Christopherson responded that they could talk about business, but that she did not want to have non-business meetings because she wanted to focus on her work.

96.     In late June 2023, during another one-on-one meeting with Soni, she asked Ms. Christopherson to complete a "People Principles" spreadsheet and write a response regarding the "3 pillars".

97.     As with McLaughlin, Ms. Christopherson explained that the "3 pillars" did not make sense to her and that she could not communicate in a way described by the "3 pillars".

98.     Soni informed Ms. Christopherson that she needed to fill out the sheet and work towards the "3 pillars" in order for her to develop her career.

99.     Ms. Christopherson reiterated that she could not communicate in a way consistent with the "3 pillars".

100.     Soni said that she saw how Ms. Christopherson wrote detailed and meticulous responses and instructions in tickets to suppliers, so there was no reason she couldn't figure out how to do this.

101.     Ms. Christopherson responded that she did not think in this way and can only write facts and truth, so the "3 pillars" made no sense to her due to the way she thinks.

102.     Soni said that she did not believe Ms. Christopherson and that Ms. Christopherson needed to stop using "that" (i.e., her autism) as an excuse. She told Ms. Christopherson that she had to do this for career development if she ever wanted to be a manager.

103.     Ms. Christopherson responded that she didn't understand what career development had to do with any of this and that she was at the top of her team and just wanted to do her job and eventually retire. Ms. Christopherson explained that she did not desire becoming a manager.

104.    Soni responded that Ms. Christopherson was "old like [her] father" and that Ms. Christopherson "doesn't want to do anything" and "[her father] doesn't want to do anything anymore either."

105.    Soni said that if Ms. Christopherson didn't fill out the worksheet, she would need to think of something to fill in when she did Ms. Christopherson's review and said that she didn't have time to write this for everyone when she did their reviews.

106.    Ms. Christopherson was insulted that Soni called her "old" and compared her to her father who "doesn't want to do anything anymore either."

107.    After a long pause, Soni went on to say that Ms. Christopherson could not be promoted to manager if she did not fill out the "Peoples Principles" under the "3 pillars" section.

108.    Ms. Christopherson, again, explained that she does not think that way.

109.    Soni, again, responded that Ms. Christopherson needs to stop making excuses (i.e., autism).

110.    After this meeting, Soni continued to force Ms. Christopherson to be more sociable despite Ms. Christopherson's disability.

111.    On one occasion, Soni refused to grant Ms. Christopherson's request for time off unless Ms. Christopherson complied with her instructions.

112.    On August 15, 2022, Ms. Christopherson asked Soni and Dumont not to share her birthday with her co-workers or publish her birthday on any third-party platforms that collect personal data. Soni and Dumont often used third-party platforms to publish and share personal information about co-workers.

113.    At the end of August, 2022, Ms. Christopherson again reiterated to Soni and Dumont that she did not want her birthday shared or publicized in any way.

114.   On September 8, 2022, Soni came into a team meeting and immediately started talking about Ms. Christopherson's upcoming birthday.

115.   On September 15, 2022, Ms. Christopherson filed a formal complaint against Soni.

116.   Ms. Christopherson's motivation for filing a complaint against Soni was to shed light on and oppose a condition or practice that she had reasonable cause to believe was illegal and in violation of the ADEA, ADA, and MHRA.

117.   On September 20, 2022, Ms. Christopherson attended a meeting with a human resources representative, Debbie McClintock ("McClintock").

118.   On October 3, 2022, Ms. Christopherson met with McClintock, Soni, and Dumont.

119.   During that meeting, they discussed Ms. Christopherson's Asperger's Syndrome diagnosis.

120.   McClintock's notes do not accurately depict the meeting that occurred. However, McClintock's notes are accurate that Soni and Dumont accused Ms. Christopherson of using her disability as an excuse.

121.   McClintock did ask Ms. Christopherson if she wanted an accommodation. However, McClintock did not give Ms. Christopherson an opportunity to respond. Instead, McClintock asked Ms. Christopherson whether she wanted an accommodation and then continued talking for another minute and shifted the discussion to another topic.

122.   Ms. Christopherson, who has been diagnosed with autism, experiences challenges in communication. Given her disability, Ms. McClintock should have recognized the necessity for a comprehensive explanation of the accommodation process. It is imperative that individuals with autism are provided with clear and unequivocal guidance on seeking accommodations.

123.    Because of Ms. Christopherson's Asperger's Syndrome and the difficulty that she has communicating, she did not return to the topic of an accommodation after McClintock changed topics. Nor are her notes accurate that Ms. Christopherson did not respond. Additionally, Ms. Christopherson did not learn what an "accommodation" was until after she was terminated. McClintock did not explain what an accommodation was or how it could help Ms. Christopherson.

124.    Ms. Christopherson understands now that her previous reports to her managers and human resources regarding the impact of her disability with regard to communications and socializing and requests to avoid certain non-essential activities were requests for accommodation.

125.    During the meeting, Ms. Christopherson felt bullied and harassed because of her disability.

126.    Despite disclosing her Asperger's Syndrome on multiple occasions, Dumont, Soni, and McClintock continued to treat Ms. Christopherson differently and worse because of her disability.

127.    Dumont criticized Ms. Christopherson's communication skills and got impatient with her.

128.    McClintock failed to inform Ms. Christopherson of what an accommodation under the ADA was and how it could help her.

129.    Soni told everyone that when she spoke to Ms. Christopherson, she felt like she was "talking to a robot."

130.    After the meeting, on October 4, 2022, Ms. Christopherson wrote to human resources by Slack and stated: "I would like to request that you have my ticket assigned to someone else. The meeting felt like you came in with the tone that since I admit my handicap, which I do only as a last resort in an attempt to get along with others, that anything that is ever said is my fault and I am to blame."

131.    Ms. Christopherson further wrote, "It felt like you invited the two individuals that have issues with me and that have both said inappropriate things to me, to a meeting to double team me…If I understood correctly, you did not ask any of my team mates about my managers behavior but seemed to have simply assumed that their behavior was/is unimpeachable, because the guy that reported issues has Asperger's."

132.    Ms. Christopherson also wrote, "I was brought into a meeting with the individual whom I am feeling harassed by, to find the individual assigned this ticket did not investigate prior to the meeting. During the meeting with the individual, I am feeling harassed by, the individual that was assigned this ticket made a statement about it being painful to work things out."

133.    Ms. Christopherson also attached a copy of her Asperger's Syndrome diagnosis.

134.    Ms. Christopherson's motivation for disclosing her Asperger's Syndrome diagnosis and reporting harassment was to shed light on and oppose a condition or practice that she had reasonable cause to believe was illegal and in violation of the ADA and MHRA.

135.    On October 12, 2022, Soni retaliated against Ms. Christopherson. Soni asked human resources, Cristine Jones ("Jones"), to open an HR ticket regarding the "issues with Ms. Christopherson's performance."

136.    In Jones's notes, she states, "A call is set up with TC at Noon CST on 10/13/2022. This call will consist of talking through his concern with this manager. I will open another ticket for the manager's issue with his performance. A separate time will be set up to discuss his performance in an effort to keep the two issues very separate."

137.    Soni's complaint to HR was retaliation and direct evidence of disability discrimination. Soni's complaint was about Ms. Christopherson's "performance" in regards to her ability to communicate. Ms. Christopherson's Asperger's Syndrome inhibits her ability to

communicate with others. Soni knew this when she filed her retaliatory complaint against Ms. Christopherson.

138.    After Soni's retaliation, she was removed from being Ms. Christopherson's manager.

139.    In November, Wayfair assigned Barndollar to be Ms. Christopherson's manager.

140.    Upon information and belief, Barndollar was aware of Ms. Christopherson's Asperger's Syndrome diagnosis, and Ms. Christopherson had previously reported Barndollar to Dumont about his mistreatment of her and his illegal actions, which Christopherson reported in good faith pursuant to the MWPA.

141.    During Barndollar's short tenure as Christopherson's manager, Christopherson and Barndollar did not interact. To the extent that Christopherson and Barndollar did interact during this period, the interactions were substantially limited to brief emails or internal messages.

142.    In January of 2023, it was announced that Wayfair would be implementing a reduction in force ("RIF").

143.    On January 3, 2023, Barndollar provided Ms. Christopherson with a discriminatory and retaliatory performance evaluation.

144.    In that performance evaluation, Barndollar repeatedly criticized Ms. Christopherson's communication skills. In one instance, Barndollar wrote, "Communication is the area for TC to focus on as we noticed TC has a hard time communicating effectively with his co-workers and leadership team maintaining a professional relationship, at times wording and language used in the team meetings were not appropriate and has made a lot of people in the meeting uncomfortable."

145.    Barndollar's statements about Ms. Christopherson's communication are direct evidence of disability discrimination.

146.    Barndollar's statements in Ms. Christopherson's 2023 performance review are false. Ms. Christopherson only directly reported to Barndollar for six (6) weeks prior to her termination. During that time, Ms. Christopherson never attended a meeting with Barndollar. Barndollar never witnessed Ms. Christopherson communicating in meetings, contrary to his statements in her performance review.

147.    The only explanation is that Barndollar received this information from Soni, McLaughlin, and Dumont, all of whom knew about Ms. Christopherson's Asperger's/Autism diagnosis.

148.    Prior to that six (6) week period, Ms. Christopherson never spoke during meetings where Barndollar was present or had any interactions.

149.    Additionally, Ms. Christopherson's prior performance evaluations state that she was respectful of her co-workers.

150.    On January 27, 2023, Ms. Christopherson was locked out of Wayfair's systems.

151.    Ms. Christopherson contacted Barndollar via Slack after being locked out and asked him what was going on and if she had been terminated.

152.    Barndollar asked if Ms. Christopherson had received the email. Ms. Christopherson later learned she was selected as part of a reduction in force ("RIF") and to look out for an email.

153.    Ms. Christopherson was then placed on administrative leave.

154.    RIFs can be used to mask discriminatory animus and can be the basis for a discrimination and retaliation action.

155.    Wayfair offered Ms. Christopherson severance and sent a proposed agreement.

156.    Ms. Christopherson rejected the severance agreement.

157.    Wayfair terminated Ms. Christopherson's employment on March 20, 2023.

158.    A RIF can be a legitimate reason for termination where the economic needs of the business require large layoffs. Sometimes, however, in determining who to include as part of the RIF, a large company like Wayfair relies on its managers to make the decision. This means that a manager's biases may play a role in selecting certain employees for termination as part of the RIF. RIFs can provide a manager cover to act on his or her discriminatory or retaliatory animus.

159.    Dumont, McLaughlin, Barndollar, and Soni were aware of or had direct access to information pertaining to Ms. Christopherson's age and Asperger's Syndrome diagnosis.

160.    Wayfair allowed individuals who knew about Ms. Christopherson's disability and reports of discrimination to select her for the RIF.

161.    Wayfair's implementation of the RIF provided managers with free reign to discriminate against employees like Ms. Christopherson.

162.    Wayfair's procedures and processes in implementing the RIF were inadequate to protect against discrimination and retaliation.

163.    Wayfair relied almost exclusively on subjective performance evaluations to determine who would be included in the RIF.

164.    Wayfair selected Christopherson for the RIF because of the discriminatory and retaliatory performance evaluation criticizing Christopherson's social skills, the very item that Christopherson's disability substantially impairs.

165.    Wayfair did not use objective criteria in selecting employees for the RIF.

166.    Without objective criteria, it is likely that Wayfair's managers relied on their subjective whims in selecting employees for the RIF, which invites bias and discriminatory animus into the decision-making process.

167.    Wayfair failed to ensure that older and disabled employees were protected from discrimination and retaliation in carrying out the RIF.

168.    Wayfair provided little or no guidance to managers implementing the RIF.

169.    Wayfair offered no objective criteria for managers to rely on in implementing the RIF.

170.    Wayfair also selected another disabled employee, DF, to be part of the RIF.

171.    Ms. Christopherson was the highest performer and most experienced IT personnel on her team.

172.    Wayfair chose to keep two other employees who had attendance and performance issues instead of Ms. Christopherson.

173.    Ms. Christopherson was able to perform the duties of her job and perform them well.

174.    During her tenure, Ms. Christopherson faced continuous discriminatory treatment based on her autism, specifically regarding her communication style.

175.    Ms. Christopherson's managers repeatedly criticized her manner of speaking, tone, and social interactions, despite her job performance meeting or exceeding expectations. The critiques in her performance reviews were directly related to characteristics of her disability, i.e., her struggles communicating.

176.    In fact, if it were not for her negative ratings about her communication skills in her 2023 Winter Performance Review, Wayfair would not have selected Ms. Christopherson for the RIF.

177.    Moreover, had Ms. Christopherson been given an accommodation and been excused from Wayfair's vague and ambiguous "We Win Together" category of performance, which dealt exclusively with the employee's sociability and communication abilities, then Ms.

Christopherson would have met or exceeded expectations and not have been selected to be a part of the RIF.

178.    Despite her managers' animus towards her autism diagnosis, Ms. Christopherson's 2022 Summer Performance Review and 2022 Winter Performance Review were both rated, overall, as met or exceeded expectations. Ms. Christopherson's 2023 Winter Performance Review, however, had an overall rating of "below our high expectations". Mr. Barndollar rated Ms. Christopherson's 2023 Winter Performance Review, and, again, he never observed Ms. Christopherson interacting with other employees.

179.    The sole negative aspects of Ms. Christopherson's 2023 Winter Performance Review pertained exclusively to her communication skills.

180.    Wayfair discriminated against Ms. Christopherson in the terms and conditions of her employment because of her age and disability.

181.    Wayfair retaliated against Ms. Christopherson for disclosing her disability.

182.    Wayfair interfered with Ms. Christopherson's right to seek and obtain a reasonable accommodation pursuant to the ADA and MRHA.

183.    Wayfair failed to provide Ms. Christopherson with a reasonable accommodation.

184.    Wayfair retaliated against Ms. Christopherson for reporting disability discrimination.

185.    Wayfair retaliated against Ms. Christopherson for reporting age discrimination.

186.    Wayfair created a hostile work environment for Ms. Christopherson because of her disability and her age.

187.    Defendant engaged in unlawful disability discrimination.

188.    The ADA and MHRA prohibit discrimination against employees on the basis of disability, including decisions made as part of a reduction in force (RIF).

189.    Employers cannot use disability-related traits as the basis for employment decisions, particularly when those traits have been historically targeted in negative performance reviews.

190.    In this case, Wayfair relied entirely on Ms. Christopherson's 2023 Winter Performance Review, which criticized her social and communication skills, the very same things that Wayfair knew Ms. Christopherson struggled with due to her disability.

191.    Wayfair's RIF selection process was tainted by bias.

192.    The fact that Ms. Christopherson's most recent performance review – conducted by a manager who barely interacted with her—was the sole basis for her termination strongly is indicative of pretext.

193.    Defendant violated the MWPA and the MHRA by retaliating against Plaintiff because she engaged in protected activity under the MWPA, as enforced through the MHRA.

194.    After Ms. Christopherson reported Steven Barndollar for fraudulent activities, Mr. Dumont sent a retaliatory Slack message asking her to ensure team members were following procedure. Additionally, after Ms. Christopherson reported Mr. Barndollar's inappropriate comments during the "Peek at you" presentations, Mr. Dumont called her into a meeting and accused her of being negative.

COUNT I – ADA Discrimination

195.    Paragraphs 1-194 are incorporated by reference.

196.    Defendant's conduct violated the ADA.

COUNT II - ADA Failure to Accommodate

197.    Paragraphs 1-196 are incorporated by reference.

198.    Defendant's conduct violated the ADA.

<u>COUNT III - ADA Retaliation</u>

199.    Paragraphs 1-198 are incorporated by reference.

200.    Defendant's conduct violated Plaintiff's right to be free from retaliation for exercising her rights under the ADA.

<u>COUNT IV - MWPA/MHRA Retaliation</u>

201.    Paragraphs 1-200 are incorporated by reference.

202.    Defendant's conduct violated the MWPA as enforced through the MHRA.

<u>COUNT V – MHRA Discrimination</u>

203.    Paragraphs 1 – 202 are incorporated by reference.

204.    Defendant has engaged in unlawful disability discrimination.

<u>COUNT VI – MHRA Failure to Accommodate</u>

205.    Paragraphs 1 – 204 are incorporated by reference.

206.    Defendant's conduct violated its duty under the MHRA to engage in the interactive process and to provide reasonable accommodations.

<u>COUNT VII - ADEA Discrimination</u>

207.    Paragraphs 1-206 are incorporated by reference.

208.    Defendant's conduct violated the ADEA.

<u>PRAYER FOR RELIEF</u>

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendant to be in violation of her rights;

B.    Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C.    Order Defendant to award front pay to Plaintiff;

D.      Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E.      Award equitable-relief for back pay, lost benefits, and prejudgment interest;

F.      Award compensatory damages in an amount to be determined at trial;

G.      Award enhanced compensatory damages in an amount to be determined at trial;

H.      Award liquidated damages;

I.      Award nominal damages;

J.      Award attorneys' fees, including legal expenses, and costs;

K.      Award prejudgment interest;

L.      Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability and/or serious health conditions;

M.      Require Defendant's owner to mail a letter to all employees notifying them of the verdict against it and stating that Defendant will not tolerate age discrimination, disability discrimination, and retaliation in the future;

N.      Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

O.      Require that Defendant train all management level employees on the prohibitions against discrimination and retaliation set out in the MHRA, MWPA, ADA, and ADEA;

P.      Grant to Plaintiff such other and further relief as may be just and proper.


                                        Respectfully submitted,

Dated: October 16, 2025                  /s/ Martin P. Tartre
                                        Martin P. Tartre
                                        Attorney for Plaintiff

                                        EMPLOYEE RIGHTS GROUP
                                        92 Exchange Street, 2nd floor
                                        Portland, Maine 04101

Tel. (207) 874-0905
Fax (207) 874-0343
martin@employeerightslaw.attorney

Date: October 16, 2025                          /s/ Chad T. Hansen
                                                Chad T. Hansen
                                                Attorney for Plaintiff

                                                EMPLOYEE RIGHTS GROUP
                                                92 Exchange Street, 2nd Floor
                                                Portland, ME 04101
                                                Tel. (207) 874-0905
                                                Fax (207) 874-0343
                                                chad@employeerightslaw.attorney